UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| THE UNITED STATES, )<br>)<br>Plaintiff, )<br>)<br>)<br>v. )<br>)<br>CROWN CORK & SEAL, USA, INC., )<br>and CROWN CORK & SEAL CO., INC., )<br>)<br>Defendants. )<br>) | Court No. 21-00361 |

DEFENDANTS' REPLY IN SUPPORT OF
<u>MOTION TO DISMISS COUNTS I AND II OF THE COMPLAINT</u>

Jackson D. Toof
Leah N. Scarpelli
Christine E. Hintze
**Arent Fox LLP**
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6000
Fax: (202) 857-6395
Email: jackson.toof@arentfox.com
        leah.scarpelli@arentfox.com
        christine.hintze@arentfox.com

*Counsel for Defendants Crown Cork
& Seal, USA, Inc. and Crown Cork
& Seal Co., Inc.*

Dated: December 7, 2021

# TABLE OF CONTENTS

I.     INTRODUCTION ....................................................................2

II.    ARGUMENT ........................................................................4

   A. Plaintiff Has Failed to Allege Facts Sufficient To Support Its Allegations of Fraud and Gross Negligence ......................................4

   B. There Is No Legal Basis to Support Plaintiff's Fraud and Gross Negligence Claims ................................................................14

III.   CONCLUSION ....................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................ 12

*United States ex rel. Bledsoe v. Cmty. Health Sys.,*
  501 F.3d 493 (6th Cir. 2007) ............................................ 17

*Chesbrough v. VPA, P.C.,*
  655 F.3d 461 (6th Cir. 2011) ............................................ 15

*United States ex rel. Clausen v. Lab. Corp. of Am., Inc.,*
  290 F.3d 1301 (11th Cir. 2002) ........................................ 15

*Currie v. Cayman Resources Corp.,*
  595 F. Supp. 1364 (N.D. Ga. 1984) .................................. 15

*DiLeo v. Ernst & Young,*
  901 F.2d 624 (7th Cir. 1990) ................................ 12, 13, 15

*E–Shops Corp. v. U.S. Bank Nat. Ass'n,*
  678 F.3d 659 (8th Cir. 2012) ...................................... 14, 15

*Exergen Corp. v. Wal-Mart Stores, Inc.,*
  575 F.3d 1312 (Fed. Cir. 2009) ........................................ 15

*In re Fiber Optek Interconnect Corp.,*
  No. 05-30015 CGM, 2011 WL 1197941 (S.D.N.Y. Mar. 31,
  2011) ................................................................................ 19

*Gross v. Diversified Mortgage Investors,*
  431 F. Supp. 1080 (S.D.N.Y. 1977) .................................. 15

*United States ex rel. Karvelas v. Melrose-Wakefield Hosp.,*
  360 F.3d 220 (1st Cir. 2004) ........................................ 20, 21

*Kearns v. Ford Motor Co.,*
  567 F.3d 1120 (9th Cir. 2009) .......................................... 15

*Luce v. Edelstein,*
802 F.2d 49 (2d Cir. 1986) .................................................. 16

*Maison v. Ford Motor Co.,*
No. 1:04–CV–041–SPM, 2005 WL 1684159 (N.D. Fla. Jul.
7, 2005) .......................................................................... 16

*Qingdao Tangbo Garments Co., Ltd. v. PRG Nouveau, LLC,*
No. 17-cv-6992 (PKC), 2020 WL 1435218 (S.D.N.Y. Mar.
24, 2020) ...................................................... 18, 19, 20, 21

*United States ex rel. Semtner v. Medical Consultants, Inc.,*
170 F.R.D. 490 (W.D. Okl. 1997) ...................................... 17

*Vess v. Ciba-Geigy Corp. USA,*
317 F.3d 1097 (9th Cir. 2003) .......................................... 15

## Statutes

19 U.S.C. § 1592 ................................................................ 14, 18

## Other Authorities

Rules of the U.S. Court of International Trade: Rule 8 (as
amended, Sept. 10, 2021) .................................................. 11

Rules of the U.S. Court of International Trade: Rule 9(b) (as
amended, Sept. 10, 2021) .......................................... *passim*

# GLOSSARY

| Acronym/Abbreviation | Item |
|---|---|
| Crown USA | Crown Cork & Seal, USA, Inc. |
| CCK | Crown Cork & Seal Co., Inc. |
| Crown Americas | Crown Americas, LLC |
| Defendants or the Crown Companies | Crown Cork & Seal, USA, Inc. and Crown Cork & Seal Co., Inc. |
| USCIT or the Court | United States Court of International Trade |
| Plaintiff or Government | United States |
| CBP or Customs | U.S. Customs and Border Protection |
| HTSUS | Harmonized Tariff Schedule of the United States |
| Can Ends | Easy Open Full Aperture Ends and metal vacuum closures |
| Count I | Fraud |
| Count II | Gross Negligence |
| IOR | Importer of Record |

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| THE UNITED STATES )<br><br>Plaintiff, )<br><br>v. )<br><br>CROWN CORK & SEAL, USA, INC., )<br>and CROWN CORK & SEAL CO., INC. )<br><br>Defendants. ) | Court No. 21-00361 |

DEFENDANTS' REPLY IN SUPPORT OF
MOTION TO DISMISS COUNTS I AND II OF THE COMPLAINT

Defendants Crown Cork & Seal, USA, Inc. ("Crown USA") and

Crown Cork & Seal Co., Inc. ("CCK") (collectively, "Defendants" or the

"Crown Companies"),[1] by and through their undersigned counsel,

respectfully submit this Reply to Plaintiff the United States' ("Plaintiff"

or the "Government") Opposition to Defendant's Motion to Dismiss,

ECF No. 13 (the "Opposition").

---

[1] Capitalized terms not otherwise defined herein have the meaning given to them in Defendants' Motion to Dismiss Counts I and II of the Complaint, ECF No. 10 (the "Motion" or "Motion to Dismiss"). The Glossary has been updated to reflect any new, defined terms.

1

## I.    INTRODUCTION

This is not a case where the alleged conduct occurred recently, and the Government has brought a lawsuit without any interaction with the opposing party and before knowing the factual landscape.  To the contrary, the Government has been investigating the alleged conduct at issue in the Complaint for over ten years.  Yet, despite interviewing Defendants' employees, numerous discussions with counsel for Defendants,[2] and having received documents in response to U.S. Customs and Border Protection ("CBP" or "Customs") administrative summonses and requests for information, the Complaint offers only a table containing the alleged misclassification of 543 can ends imported from Europe as the sole basis to support its claims of fraud, gross negligence, and negligence.  The Government says that is sufficient to state a claim for fraud and gross negligence; Defendants believe it is not, especially where, as here, there has been a decade-long investigation leading up to the filing of the Complaint.  Indeed if the table attached to the Complaint—without more—is sufficient to state a

---

[2] This includes the time and expense of counsel for Defendants traveling to Milwaukee, WI to meet with CBP officials regarding this matter in 2016.

claim for fraud and gross negligence, the implications will be groundbreaking. Every inadvertent misclassification of a HTSUS subheading would be susceptible to such claims, effectively weaponizing conduct that is, at best, negligence.

The Motion to Dismiss asserts that the Complaint filed by the Government lacks the requisite facts needed to support a claim of fraud or even a claim of gross negligence. As detailed in the Motion, the facts alleged, at best, state a claim of negligence at this preliminary stage, with the additional claims of fraud and gross negligence grounded only in pure speculation.

The Government's Opposition contains no new facts or legal authority that would substantiate its allegations of fraud and gross negligence against the Crown Companies, nor the windfall penalty amount it is seeking in connection with this matter. Instead, the Government makes the remarkable, conclusory assertion that the Crown Companies, in misclassifying the Easy Open Full Aperture Ends and metal vacuum closures ("<u>can ends</u>"), were "co-conspirators" engaged in fraud simply because they were controlled by the same holding company. Opp. at 1-3.

As discussed herein, the Government's arguments are meritless. Despite a decade-long investigation, during which the Crown Companies fully cooperated, the Government remains unable to identify any conduct by the Crown Companies that could raise its allegation of incorrect tariff classification beyond a simple negligence claim. Because the Government has pled only bare, conclusory elements of fraud and gross negligence, the Court should dismiss Counts I and II as a matter of law *with prejudice*.[3]

## II.    ARGUMENT

### A.    Plaintiff Has Failed to Allege Facts Sufficient To Support Its Allegations of Fraud and Gross Negligence

Throughout its response, the Government asserts without basis that the Crown Companies "intentionally misclassified" entries of can ends from Europe. Opp. at 1-2, 21. However, the Government presents no factual basis for its conclusion that the misclassification of these entries was intentional. Instead, the Government's fraud allegation is

---

[3] The Crown Companies respectfully submit that this is not a case where the Court should afford the Government leave to amend in light of the lengthy investigation that pre-dated the filing of the Complaint.  If the Government had more, it should have been included in the Complaint or even alluded to in the Opposition. Tellingly, it was not.

premised solely on the fact that can ends from Europe were misclassified, while can ends from Canada were classified correctly. Opp. at 4.

The Government's argument presumes, through conclusory allegations plead in the Complaint, that unidentified personnel importing can ends from Europe and Canada were in communication regarding the classification, that those personnel knew how to classify the can ends correctly, and that those personnel intentionally misclassified entries from Europe to avoid payment of 2.6% duties, solely on the basis that CCK, Crown USA, and its suppliers are related. Opp. at 22-23. The Government has overreached.[4]

The Government's argument ignores that common ownership is insufficient to impute knowledge of one company's classifications to another, as the Government asserts. Opp. at 1-3, 8-10, 29. The Government labeled Crown as a "hydra-headed international conglomerate that employed over 27,000 people" during the relevant period. Opp. at 27. Thus, in this context the Government's premise that

---

[4] Such conclusory allegations would open the door to every related party transaction potentially being subject to a fraud claim where there is a mistake in entry declarations.

"all of the companies in the supply chain were . . . knowledgeable about conduct of other companies in the supply chain" by sole reason of common ownership, is implausible at best. Opp. at 2. Though the Crown Companies are related and owned by the same holding company, the "apparent implications" of this fact alone are insufficient to establish a conspiracy to commit fraud or even gross negligence. Opp. at 2.

The Government's argument assumes the Crown Companies were related and hence inherently familiar with each other's tariff classifications, which ignores entirely the factual context of Crown's corporate organization and structure at the time of the relevant entries. As the Government notes in its Opposition, CCK and Crown USA are both now ultimately subsidiaries of Crown Holdings. Opp. at 2. Previously, however, CCK was the publicly-traded parent of the entire Crown group. In 1996, CCK created Crown USA to hold all the assets of its U.S. business, including facilities and inventory. Crown Holdings was created in 2003 and took over the role of CCK as the publicly-traded parent company of the Crown group. *See* Opp. at Exhibit 1, ECF 13-2 (Crown Holdings Form 10-K for Period Ended December 31, 2004 at 35) ("In connection with its refinancing and reorganization in 2003. . .

[CCK] formed a new public holding company named Crown Holdings, Inc. [CCK] is now a wholly-owned subsidiary of Crown Holdings, Inc."). In 2005, Crown Americas, LLC ("Crown Americas") was created as an entity between CCK and Crown USA, such that Crown Holdings owns CCK, which in turn owns Crown Americas, which in turn owns Crown USA. *See* Opp. at Exhibit 2, ECF 13-3] (Crown Holdings Form 10-K for Period Ended December 31, 2009 at 104) (referring to Crown Americas as a "100% owned subsidiar[y]" of Crown Holdings).

With these changes, there was also an intercompany realignment of responsibilities, including a clarification of Crown USA's role as the main importing entity for the Crown Companies. However, this transition, which involved not only customs entries but also every form of expression used by the Crown Holdings and its subsidiaries (*i.e.*, letterheads, building signs, standard form contract documents, business cards, breakroom posters, etc.), took some time to work its way through the tens of thousands of global employees of the corporate group. What the Government characterizes as a "fraud conspiracy," Opp. at 10, was at worst an absence of coordination resulting from this major reorganization of a "multi-billion dollar international conglomerate of

companies" operating 185 manufacturing, sales, and service facilities in 43 countries, and nothing more. Opp. at 5.

Importantly, the Government's argument ignores that during the relevant period, decision-making for customs issues was decentralized, with CCK and Crown USA having retained different importer of record ("IOR") numbers and different, external unrelated brokers for imports from Canada and Europe, respectively, which operated separately. *And the Government knows this through its investigation.* Despite a singular focus on the corporate structure and organization of the Crown Companies in its Opposition, Opp. at 5-6, the Government fails to acknowledge the critical fact that different customs brokers were used to enter those can ends imported from Canada and those imported from Europe. Mot. at 3-4, 12. Indeed, there is no allegation suggesting there is any evidence that the same employees of CCK and Crown USA supplied the information relating to the classification of can ends to the two different brokers *at all*, let alone that they were even aware of the difference in classifications.

In this context, the Government's contention that the Crown Companies corporate affiliation "foreclos[es] the possibility that there

was confusion" about the correct classification of can ends is without merit. Opp. at 4. To the contrary, given the size and decentralization of the Crown Companies during this time, the misclassification of a comparatively small sub-set of can ends as "Other articles of iron or steel: Other: Of tinplate" under subheading 7326.90.1000 of the Harmonized Tariff Schedule of the United States ("HTSUS"), which is not facially incorrect, was simple negligence at best. The Government's theory of the case is further undermined by the fact that the Crown Companies took corrective action as soon as they became aware of the discrepancy in the classification of can ends, including by filing prior disclosures,[5] engaging private customs counsel to review tariff classifications and other customs procedures, hiring an experienced licensed customs broker to oversee the Crown Companies' customs filings, and developing a customs compliance program.

---

[5] The Government again fails to indicate that the Crown Companies promptly filed voluntary prior disclosures when made aware of the erroneous classification. Crown USA filed an initial prior disclosure on June 26, 2009, and filed a final written submission on September 23, 2009. A loss of revenue in the amount of $806,548 was tendered by Crown USA as part of the final prior disclosure. CCK filed an initial prior disclosure on October 16, 2009 and filed a final written submission on December 14, 2009. A loss of revenue in the amount of $364,288 was tendered by CCK as part of the final prior disclosure.

As Defendants explained in their Motion, beyond generic allegations and broad references to Crown's corporate structure, the Government does not and cannot allege that the Crown Companies presented intentionally falsified invoices or value data, misrepresented content or origin, falsely described the goods, or otherwise engaged in conduct present in other cases alleging fraud or gross negligence. *See* Mot. at 11-12, 19-21. Nor is there any evidence that the divergent classifications were the result of any coordination between the Crown Companies and the independent brokers; this despite the full cooperation of the Crown Companies during a ten-year investigation in which Plaintiff interviewed employees involved with import compliance at the Crown Companies' headquarters, conducted numerous discussions with counsel, and received large quantities of documents concerning the corporate structure of the Crown Companies and the manufacture and importation of can ends.[6]

---

[6] While Plaintiff points to the Crown Companies' "reocurring request" for an extension of time during the administrative penalty phase, which delayed the proceeding by three months, Opp. at 8, it fails to mention the eight statute of limitation waivers requested from the Government and executed by the Crown Companies since 2009, which delayed this proceeding by more than 10 years.

As the Government acknowledges, a complaint must detail the "'who, what, where, when and how' of the scheme [to] satisf[y] the pleading requirements of Rules 8 and 9(b)." Opp. at 2. Although the Government contends that its Complaint "details the motive and means by which defendants carried out the scheme," Opp. at 3, all it details is that 543 import entries from Europe were incorrect. For example, the Government purports that Crown Company agents and employees "supplied information relating to classification of imported metal lids to brokers retained by defendants," Opp. at 7, but fails to show what, if anything, the Crown Companies actually provided to their respective brokers regarding the classification of can ends. Mot. at 12. Likewise, given the size of the Crown Companies and the use of separate brokers for entries from Europe and Canada, a conclusory allegation of "CCS and CCS USA agents knew that metal lids imported from Europe were classified differently than metal lids imported from Canada" is simply insufficient as a matter of law to sustain a fraud or gross negligence. Opp. at 9; Mot. at 12-13. And, significantly, Plaintiff does not provide any substantiation for its conclusory statement of actual knowledge and the implication of intent to commit fraud. Opp. at 9-10; Mot. at 11-12.

In light of these fundamental deficiencies, the Government's focus on the "names of specific CCS or CCS USA employees" and "the discrete information [those] employees may have passed on," Opp. at 2-3, 25, misses the point. Whether the Crown Companies are considered "persons" is irrelevant given the Government's inability to show that the misclassification of can ends was a coordinated scheme by the Crown Companies or the means (*i.e.* the "how") of such a scheme. The use of an incorrect HTSUS subheading "in lieu of the correct HTSUS subheading," Opp. at 24, does not amount to fraud, nor provide an explanation for how such a fraud was carried out.

Moreover, the Government presents no motive for the Crown Companies or "their co-conspirators," presumably individual employees of the Crown Companies, to misclassify intentionally the can ends at issue. Opp. at 10. In "determining whether a complaint states a plausible claim" the court is tasked with "draw[ing] on its experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).[7] Even

---

[7] The Government cites *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990), which "instruct[s] that a complaint must identify 'the who, what, where, when and how' of the scheme." Opp. at 23. In *DiLeo*, however, the reviewing court found the complaint to be inadequate based on its failure to identify the perpetrator of the alleged fraud or "what that person might have had to gain" from their participation. *DiLeo*, 901 F.2d at 629. Specifically, the court found the claim to be "irrational"

the Government concedes that only a very small fraction of the Crown Companies' U.S. can end sales, and an even smaller fraction total food can sales, had any connection to these imports. Opp. at 5. The 543 entries at issue represent only a tiny fraction of the Crown Companies' imports. The associated unpaid duties resulting from the 2.6 percent *ad valorem* duty rate on these entries is miniscule when compared to the Crown Companies' total sales during the relevant time period.[8] There is no "common sense" motivation for the Crown Companies to perpetrate this alleged complex fraud scheme for such insignificant duty savings. Because Crown employees are not in any manner compensated on the basis of cost savings that might be engendered by tariff rates, and the Government has not alleged receipt by any employee or agent of "kickbacks" or any other incentives for duty savings, there would similarly not be any incentive for an individual employee to unilaterally

---

where the defendant "shared none of the gain from any fraud and were exposed to a large fraction of the loss." *Id.* Though "[p]eople sometimes act irrationally, . . . indulging ready inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud" and, as such, "[o]ne who believes that another has behaved irrationally has to make a strong case." *Id.* The Government has not done so here.

[8] Notably, as the Government concedes, the Crown Companies promptly submitted a check for unpaid duties and "[n]either defendant owes unpaid duties to the Government." Opp. at 8.

change or to cause to be changed the classification of these imports to avoid additional duties.

That two related entities in a corporate structure of this size had inconsistent classifications and lacked oversight of different brokers handling shipments of can ends from two different parts of the world cannot elevate a simple negligence claim to one of fraud or even gross negligence. The facts alleged by the Government in its Complaint and in its Opposition at best state a claim—at the pleading stage—for negligence, not fraud or gross negligence.

### B. There Is No Legal Basis to Support Plaintiff's Fraud and Gross Negligence Claims

As Plaintiff twice notes, "[t]he level of [necessary] particularity depends on the nature of the [sic] case." Opp. at 16 and 29 (quoting *E–Shops Corp. v. U.S. Bank Nat. Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012)).[9] Yet, unable to allege facts consistent with those typically found in customs fraud penalty cases under 19 U.S.C. § 1592, the Government relies on various cases dating back to the 1970s involving a veritable

---

[9] In *E–Shops*, the court dismissed the complaint as not satisfying Rule 9(b)'s particularity requirements where, as here, it failed to "identify the employees, state their positions . . ., state how they acquired [fraudulent] information, or whether the employees were authorized to speak on behalf of [Defendant]." *E-Shops*, 678 F.3d at 663–64.

cornucopia of industries separate and apart from importers, including

healthcare, securities, patents, consumer products, diversity class

actions, breach of implied warranty, and other areas. Opp. at 12-21.[10]

---

[10] Ironically, in at least eleven of the cases cited by the Government, the reviewing courts ultimately found that fraud was <u>not</u> pled with requisite particularity. *See, e.g.*, *Currie v. Cayman Resources Corp.*, 595 F. Supp. 1364, 1373 (N.D. Ga. 1984) (dismissing the "inspecific" allegations in the complaint as deficient because they did not demonstrate "intent to defraud"); *Gross v. Diversified Mortgage Investors*, 431 F. Supp. 1080, 1087-89 (S.D.N.Y. 1977) (dismissing the first and second claims of the complaint because the claims were based on "information and belief" and did not include a "statement of facts upon which the belief is founded" such that the elements of fraud were not set forth with particularity under Rule 9(b)); *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1328-29 (Fed. Cir. 2009) (finding the allegations of inequitable conduct by defendants to be deficient under Rule 9(b) for failure to identify the specific who, what, when, where, and how of the material misrepresentation or omission that was the subject of the allegations); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009) (dismissing certain nondisclosure claims for lack of particularity where they were generally plead and did not allege the particular circumstances surrounding the misrepresentations surrounding the fraud claim); *DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990) (affirming the dismissal of the complaint for failure to plead fraud with particularity where the who, what, where, and how of the allegations of fraud did not appear in the complaint); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (affirming the District Court's dismissal of the first amended complaint with respect to one of the defendants based on the plaintiff's failure to provide the particulars of when, where, or how the alleged fraudulent conspiracy occurred); *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1312 n.21 (11th Cir. 2002) (affirming the District Court's dismissal of the first amended complaint for failing to meet the required standard for pleading fraud under Rule 9(b) where the plaintiff alleged no specific facts regarding the actual submission or timing of false claims and relied only on conclusory statements); *E–Shops Corp. v. U.S. Bank Nat. Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012) (holding that the plaintiff did not sufficiently set forth a claim showing that defendant aided and abetted fraud under Rule 9(b) where the complaint was devoid of factual allegations surrounding the alleged fraud, including how it occurred, when it occurred, or where it occurred); *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 472 (6th Cir. 2011) (finding that plaintiffs failed to plead fraud with particularity where the plaintiffs had no personal knowledge of the fraudulent allegations and where the alleged facts did not support an inference of fraud); *Maison v. Ford Motor Co.*, No. 1:04–CV–041–

The Government attempts to draw a comparison to "[s]ecurities fraud litigation" in particular as "instructive." Opp. at 21. However, "insiders or affiliates participating in the offer of . . . securities," *Id.* at 16 (quoting *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986)) are wholly distinguishable from the Company import compliance personnel and independent brokers responsible for the classification of entries in this case. The misclassification of can ends as "[o]ther articles of iron or steel: Other: Of tinplate" under HSTSUS subheading 7326.90.1000 on public entry documents, though technical, was not "shrouded behind the portiere of collective action" and is inapposite to the "specific inner-machinations" at issue in a securities action. *Id.* at 21, 26-27.

In addition, the Government's effort to categorize the Crown Companies' misclassification of can ends as a "complex fraud scheme" is similarly unavailing. Opp. at 16. The complexities in the cases cited by the Government are not only absent here, but also do not negate the

---

SPM, 2005 WL 1684159, at *2 (N.D. Fla. Jul. 7, 2005) (dismissing the complaint where plaintiffs' allegations were broad and did not provide the particular information required to meet the heightened requirement of Rule 9(b)); *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986) (affirming the District Court's decision to dismiss the complaint for failure to plead fraud with particularity where the complaint did not connect the allegations of fraudulent representations to particular defendants and did not allege specific facts to support the claims of fraud).

particularity requirements of USCIT Rule 9(b). For example, in *United States ex rel. Semtner v. Medical Consultants, Inc.*, 170 F.R.D. 490, 498 (W.D. Okl. 1997), Opp. at 17, the court found that the "exact nature of each allegedly fraudulent document" need not be pled where there were "thousands of billing documents." *Id.* at 498. However, the district court still required the government to identify "how the scheme operated" and to provide a description of "the defendants' actions," even though it did not identify them by name. *Id.* Likewise, in *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 510-11 (6th Cir. 2007), Opp. at 17, although the court found that "pleading every instance of fraud would be extremely ungainly, if not impossible," it still required the parties to "provide some examples of fraudulent conduct" and "examples of specific false claims submitted to the government," including their "general time frame, substantive content, and relation to the allegedly fraudulent scheme." *Id.* at 509-11.

While the Government points to the table identifying each of the 543 misclassified HTSUS subheadings as providing the requisite "detail which allows CCS and CCS USA to mount a full defense," Opp. at 23, those entries, without more, do not describe, imply, or suggest improper

conduct, and provide no notice to the Crown Companies of the "complex fraudulent scheme" in which the Government believes that the Crown Companies participated. In fact, the Government provides no details connecting at least a sampling of those 543 entries to the allegedly fraudulent scheme or conduct that rises to the level of gross negligence.

It is well established that an allegation of fraud carries a heighten burden of proof well-established in U.S. law and an examination of precedent under 19 U.S.C. § 1592 reveals that the fraud provision is not intended to punish this type of inadvertent misclassification. Mot. at 9-11. As detailed in the Motion to Dismiss, cases that have arisen in this context consistently involve negligence claims, not fraud. *See* Mot. at 19-22 (citing *United States v. Great Neck Saw Manufacturers, Inc.*, No. 17-00049, 2018 WL 1840207, at *1, *4 (Ct. Int'l Trade Apr. 16, 2018); *United States v. Sterling Footwear Inc.*, 279 F. Supp. 3d 1113 (Ct. Int'l Trade 2017)).

Rejecting these cases, Opp. at 28-29, the Government instead points the Court to *Qingdao Tangbo Garments Co., Ltd. v. PRG Nouveau, LLC*, No. 17-cv-6992 (PKC), 2020 WL 1435218, at *11 (S.D.N.Y. Mar. 24, 2020), which it claims supports a finding of fraud by

reason of "circumstantial evidence," such as common ownership. Opp. at 15, 22-23. However, the facts at issue *Qingdao* are wholly distinguishable from those alleged by the Government. In *Qingdao*, which involved the fraudulent conveyance of assets, the court found the Rule 9(b) particularity requirement to be satisfied where there was, amongst other things, "common management and ownership," but noted that a different standard would apply if the allegation involved false statements.[11] 2020 WL 1435218, at *11. The courts have recognized that claims of fraudulent conveyance and fraudulent misrepresentation, like those at issue here, "have different intent requirements," with a claim for fraudulent conveyance requiring a showing by "clear and convincing evidence [of]: 1) a conveyance; 2) made with actual intent to defraud." *In re Fiber Optek Interconnect Corp.*, No. 05-30015 CGM, 2011 WL 1197941, at *7 (S.D.N.Y. Mar. 31, 2011). By contrast, a claim of fraudulent misrepresentation requires "specific statements alleged to be fraudulent or those statements' speakers" to be alleged with particularity. *Qingdao*, 2020 WL 1435218, at *11. The Government has

---

[11] The Government maintains that the 543 entries are false statements. *See* Opp. at 25 ("The complaint, and the table attached to the complaint – expressly identify that CCS and CCS USA made the false statements.").

made no such identification here, which is a glaring omission against the backdrop of a ten year investigation.

The Government also cites *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 233 (1st Cir. 2004), a case involving a health care providers' alleged submission of false Medicare and Medicaid claims to the federal government, as providing "instructive" guidance for "the type of specificity needed to satisfy Rule 9(b)'s particularity requirement." Opp. at 16. The Government notes "that each of the desiderata identified in *Karvelas* was identified by the Government in the complaint in this case," Opp. at 16, but fails to mention in its Opposition that the court ultimately dismissed the complaint in *Karvelas* for "failure to identify with particularity any actual false claims that the defendants submitted to the government[.]" *Karvelas*, 360 F.3d at 235. Specifically, while the complaint identified sixteen separate schemes to defraud the government, including the false certification of cost reports and confirmation of orders, it did "not identify or describe the individuals involved in the improper billing or allege with particularity any certification of compliance with federal regulations in order to obtain payments." *Id.* at 233. Amongst other

things, this failure to provide a "factual basis for [the] conclusory allegations that the defendants submitted actual false or fraudulent claims to the government," was found to be "fatal" to the complaint. *Id.* at 233.

Finally, the Government quotes *Shields v. Citytrust Bancorp, Inc.*, to support its argument that an allegation of fraud may be based on "facts 'that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" Opp. at 15 (quoting 25 F.3d 1124, 1128 (2d Cir. 1994)). However, the court in *Shields* ultimately found the complaint to lack sufficient particularity because, as is the case here, the allegations lacked "particularized facts to support the inference that the defendants acted . . . with fraudulent intent." *Shields*, 25 F.3d at 1129. The court specifically found that a "pleading technique . . . coupl[ing] a factual statement with a conclusory allegation of fraudulent intent" did not satisfy the requirements of Rule 9(b). *Id.*

Neither *Qingdao*, *Karvelas*, *Shields,* nor any of other cases cited by the Government, support its position that the Crown Companies' had knowledge of the correct classification of can ends being imported from Europe by virtue of their affiliation with the manufacturing companies

and intentionally failed to use the correct classification. Without more, this circumstantial evidence and conclusory allegations are not enough to support the Government's allegations of fraud or even of gross negligence.

## III.  CONCLUSION

The Court should require the Government to allege only causes of action for which it has sufficient facts. And after ten years of investigating the misclassification of 543 entries, the Government has failed to plead facts sufficient to sustain a claim of fraud or gross negligence. Simply identifying misclassified HTSUS subheadings cannot be the basis for fraud or even gross negligence claims, otherwise it could open a fraud chasm into which inadvertent tariff misclassifications will fall.

For these reasons and the reasons identified in the Motion to Dismiss, the Crown Companies respectfully request that the Court dismiss Counts I and II of the Complaint *with prejudice*, and deny any

request by the Government for leave to amend its Complaint.

Respectfully Submitted,

**/s/ Jackson D Toof**
Jackson D. Toof
Leah N. Scarpelli
Christine E. Hintze

**Arent Fox LLP**
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6000
Fax: (202) 857-6395
Email:   jackson.toof@arentfox.com
            leah.scarpelli@arentfox.com
            christine.hintze@arentfox.com

*Counsel for Defendants Crown Cork & Seal, USA, Inc. and Crown Cork & Seal Co., Inc.*

# CERTIFICATE OF COMPLIANCE

I, Jackson D. Toof, an attorney with the law firm Arent Fox LLP, which represents Defendants in this action, relying up on the word count feature of the word processing program used to prepare this motion, hereby certify that this motion complies with the word count limitation under the Court's Chamber Procedures, and contains 4,912 words.