UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |  |
|---|---|---|
| THE UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Court No. 21-00361 |
| | ) | |
| CROWN CORK & SEAL, USA, INC., | ) | |
| and CROWN CORK & SEAL CO., INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS
COUNTS I AND II OF THE AMENDED COMPLAINT

Jackson D. Toof
Leah N. Scarpelli

**ArentFox Schiff LLP**
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6000
Fax: (202) 857-6395
Email: jackson.toof@afslaw.com
        leah.scarpelli@afslaw.com

*Counsel for Defendants Crown Cork
& Seal, USA, Inc. and Crown Cork
& Seal Co., Inc.*

Dated: August 17, 2022

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................2

II.  ARGUMENT .............................................................................4

    A.  Plaintiff Has Failed To Allege Facts Sufficient To Support Its Allegations of Fraud and Gross Negligence ...................................4

       1.  The Crown Companies Do Not Specialize in the Import of Can Ends ...............................................................................5

       2.  Common Ownership Does Not Impute Knowledge of HTSUS Classifications .................................................................8

       3.  Differences in the Classification of Can Ends Are the Result of Separate Brokers ..........................................................13

       4.  Import Statistics do not Establish that the Misclassification of Can Ends was Intentional ...............................................18

    B.  There Is No Legal Basis To Support Plaintiff's Fraud Claim .....24

    C.  There Is No Legal Basis To Support Plaintiff's Gross Negligence Claim ..........................................................................30

III.  CONCLUSION .........................................................................33

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)........................................................................21, 28

*DiLeo v. Ernst & Young,*
   901 F.2d 624 (7th Cir. 1990)...............................................................21

*E–Shops Corp. v. U.S. Bank Nat. Ass'n,*
   678 F.3d 659 (8th Cir. 2012)...............................................................24

*Kahrs Int'l, Inc. v. United States,*
   33 C.I.T. 1316 (2009)..........................................................................17

*United States ex rel. Karvelas v. Melrose-Wakefield Hosp.,*
   360 F.3d 220 (1st Cir. 2004) .........................................................28, 29

*United States ex rel. Semtner v. Medical Consultants, Inc.,*
   170 F.R.D. 490 (W.D. Okl. 1997) ........................................................25

*Sioux Honey Ass'n v. Hartford Fire Ins. Co.,*
   672 F.3d 1041 (Fed. Cir. 2012) ...........................................................24

*United States v. Great Neck Saw Manufacturers, Inc.,*
   No. 17-00049, 2018 WL 1840207 (Ct. Int'l Trade Apr. 16,
   2018)...................................................................................................31

*United States v. Nat'l Semiconductor Corp.,*
   30 C.I.T. 769, *modified on reconsideration,* 30 C.I.T. 1428
   (2006), *vacated and remanded,* 496 F.3d 1354 (Fed. Cir.
   2007)...................................................................................................19

*United States v. Sterling Footwear Inc.,*
   279 F. Supp. 3d 1113 (Ct. Int'l Trade 2017).........................31, 32, 33

*United States v. UPS Customhouse Brokerage, Inc.,*
   31 C.I.T. 1023 (2007)..........................................................................17

**Statutes**

19 U.S.C. § 1592 ....................................................................... 28

19 U.S.C. § 1592(c)(4) ............................................................. 19

**Other Authorities**

Rules of the U.S. Court of International Trade: Rule 9(b) (as
    amended, Sept. 10, 2021)...................................... 24, 25, 30

## **GLOSSARY**

| Acronym/Abbreviation | Item |
|---|---|
| Crown USA[1] | Crown Cork & Seal, USA, Inc. |
| CCK[2] | Crown Cork & Seal Co., Inc. |
| Defendants, Crown Companies, or Crown | Crown Cork & Seal, USA, Inc. and Crown Cork & Seal Co., Inc. |
| Crown Americas | Crown Cork & Seal Americas, Inc |
| Initial Motion to Dismiss | Motion to Dismiss Counts I and II of the Complaint |
| Motion to Dismiss | Crown Companies' Motion to Dismiss Counts I and II of the Amended Complaint |
| Can Ends | Easy Open Full Aperture Ends and metal vacuum closures |
| CAFC | Court of Appeals for the Federal Circuit |
| NCBFFA | National Customs Brokers and Freight Forwarders Association |
| USCIT or the Court | United States Court of International Trade |
| Plaintiff or Government | United States |
| CBP or Customs | U.S. Customs and Border Protection |
| HTSUS | Harmonized Tariff Schedule of the United States |
| USC | United States Code |
| USCA | United States Code Annotated |

[1] "Crown USA" is referred to as "CCS USA" in the Opposition to Defendants' Motion to Dismiss Counts I and II of the Amended Complaint.

[2] "CCK" is referred to as "CCS" in the Opposition to Defendants' Motion to Dismiss Counts I and II of the Amended Complaint.

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |  |
|---|---|---|
| THE UNITED STATES | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Court No. 21-00361 |
| | ) | |
| CROWN CORK & SEAL, USA, INC., | ) | |
| and CROWN CORK & SEAL CO., INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS
COUNTS I AND II OF THE AMENDED COMPLAINT

Defendants Crown Cork & Seal, USA, Inc. ("Crown USA") and
Crown Cork & Seal Co., Inc. ("CCK") (collectively, "Defendants," the
"Crown Companies" or "Crown"),[3] by and through their undersigned
counsel, respectfully submit this Reply to the Government's Opposition
to Defendants' Motion to Dismiss Counts I and II of the Amended
Complaint, ECF No. 26 (the "Opposition").

---

[3] Capitalized terms not otherwise defined herein have the meaning given to them in
Defendants' Motion to Dismiss Counts I and II of the Amended Complaint, ECF No.
24 (the "Motion" or "Motion to Dismiss"). The Glossary has been updated to reflect
any new, defined terms.

1

## I.     INTRODUCTION

The Government's Amended Complaint and Opposition, when compared to the initial Complaint, contains absolutely nothing new. This case is nothing more than a negligence case masquerading as a fraud (and gross negligence) case simply because the Government insists on asserting conclusions rather than facts.  As a result, the Amended Complaint continues to lack the requisite facts needed to support a claim of fraud or gross negligence. As detailed in the Motion to Dismiss, the facts alleged, at best, state a claim of negligence, while the additional claims of fraud and gross negligence remain grounded only in pure speculation.

Again, this is not a case where the alleged conduct occurred recently, and the Government has brought a lawsuit without any direct interaction with the Defendants for 11 years and before knowing the factual landscape.  The Government has been investigating the alleged conduct for over a decade, during which Crown fully cooperated by participating in interviews, providing thousands of pages of documents in response to administrative summonses and requests for information from CBP, and agreeing to *eight* statute of limitation waivers requested

by CBP.[4]  Yet even with leave to amend its Complaint, the Government

remains unable to identify any conduct by Crown that could raise its

allegation of incorrect tariff classification beyond a simple negligence

claim. Instead, the Government continues to make the remarkable,

conclusory assertion that the Crown Companies, in inadvertently

misclassifying can ends, were engaged in a complex fraudulent scheme.

Opp. at 17.  Because the Government continues to plead only bare,

conclusory elements of fraud and gross negligence, the Court should

dismiss Counts I and II as a matter of law *with prejudice*.[5]

---

[4] In its Opposition, the Government asserts that the Crown Companies played a
role in the delay of this matter because they "repeatedly entered into statute-of-
limitations waivers" with CBP. Opp. at 10-11. Not so.  CBP *requested* the waivers
and Crown agreed to them as a sign of cooperation with CBP's investigation. CBP
waited five years from its 2011 investigation to its issuance of the pre-penalty
notice. It took no actions in between other than to request statute of limitation
waivers.  The Government's related reference to the Crown Companies' "many
requests [for an extension of time to respond] during the administrative penalty
phase" is similarly misleading. Opp. at 10. The delay in the prosecution of this case
was in no way caused by Crown's request for a short extension of time in the
penalty phase, which delayed the proceeding by three months; rather, the eight
statute-of-limitation waivers expressly requested by CBP delayed this proceeding *by
more than 10 years*.

[5] The Court gave the Government an opportunity to amend its Complaint.  The
Court should not entertain any further amendments.

## II.   ARGUMENT

### A.   Plaintiff Has Failed To Allege Facts Sufficient To Support Its Allegations of Fraud and Gross Negligence

As the Government acknowledges, a Court must "determine whether [ *facts in a complaint* ] plausibly give rise to an entitlement to relief." Opp. at 3 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (emphasis added)). However, the Government has pled no actual *facts* sufficient to support its claims for fraud or gross negligence. The Government's central argument is that, because most imports of can ends from Europe were classified incorrectly, while most imports of the same product from Canada were classified correctly, the misclassification of can ends from Europe could not have been a "coincidence or mistake," but must have been, as a matter of *fact*, a "concerted strategy." Opp. at 2. Essential to the Government's allegations is a directive to the Court to assume, as a matter of *fact*, that Crown's misclassification of can ends from Europe was done "knowingly" or "intentionally." Opp. at 8-9.

Throughout its Opposition, the Government asserts that  Crown "intentionally misclassified" entries of can ends, but presents no factual basis whatsoever for its conclusion. Opp. at 9. Still, the Government

argues that the Amended Complaint provides circumstantial evidence that Crown *knew* the classification of the can ends from Europe was incorrect, specifically citing (1) "the long history of these companies specializing in the manufacture and import of these metal lids," (2) "their common ownership and management," (3) "their correct classification of lids from Canada," and (4) "the virtually nil statistical probability that this false classification could have been the result of a miraculous coincidence." Opp. at 22. Looking more closely at each of these assertions, however, it is clear that none supports the Government's allegations of fraud and gross negligence.

### 1. The Crown Companies Do Not Specialize in the Import of Can Ends

As evidence that Crown misclassified the entries of can ends "knowing [the classification was] false," the Government first cites the Crown Companies' "long history" as an importer of can ends. Opp. at 22. Though the Government contends that Crown has specialized in the manufacture of can ends "for 100 years," Opp. at 2, Crown in fact did not even begin to produce this product in Europe (and thereby import it into the U.S.) until it acquired a European can manufacturer in 1996.[6]

---

[6] *See* https://www.crowncork.com/about/history-and-timeline.

In the Amended Complaint, the Government continues to emphasize its incorrect conclusion that, because the HTSUS "subheading definition [for can ends] used the same three words that form the corporate names of both [ CCS and Crown USA ], *i.e.* 'Crown,' 'corks' and 'seals,'" Crown must have known the correct classification of metal lids. Am. Compl. ¶ 18. In the Opposition, the Government reiterates that can ends "should be described and classified as "Stoppers, caps and lids (including **crown corks,** screw caps, and pouring stoppers), capsules for bottles, threaded bungs, bung covers, **seals** and other packing accessories, and parts thereof, of base metal: Other [than Crown corks (including **crown seals** and caps), and parts thereof]." Opp. at 5-6 (emphasis in original).

By bolding the words crown, cork, and seal (as shown above), the Government continues to imply mistakenly that the Crown Companies must have been familiar with the classification of can ends, presumably because the classification includes a part of Crown's name.  The Government's supposition misunderstands the product it is alleging to be fraudulently misclassified, *i.e.* can ends, which are wholly separate from "crown corks" (known as bottlecaps in modern parlance) or "seals," and are classified under a separate 10-digit subheading of the HTSUS.

Mot. at 18-19.

The Government's theory that Crown somehow knew (or should have known) the correct classification simply because they are "sophisticated importers" that "specialized in the manufacture of these lids" is without merit. Opp. at 2. As an initial matter, the correct classification of can ends as "other stoppers, caps and lids, capsules for bottles, threaded bungs, bung covers, seals and other packing accessories, and parts thereof, of base metal," rather than as "other articles of iron or steel: other: of tinplate" is not obvious on its face and was only revealed to Crown by its Customs counsel following a review of the HTSUS Explanatory Notes and relevant CBP rulings. Mot. at 18-19.

Moreover, as the Government acknowledges, Crown operates "within a billion-dollar conglomerate," with food can ends being one of many products imported by Crown. Opp. at 2. Other than the company name, which references "crown corks" (again, a term for bottlecaps) and seals, the Government offers no facts indicating that the inadvertent misclassification of a relatively small number of entries over a six-year period was a "concerted strategy," nor that any of Crown's many

employees "knew these statements were false." Opp. at 2. To the contrary, Crown's size and diverse product lines, as well as the global sourcing of products from related companies, further demonstrates the vastness of Crown's operations and explains that the employees who may have unwisely failed to oversee customs entry filings made by customs brokers would not be aware of a discrepancy in the classification of can ends coming from various parts of the world.[7]

### 2. Common Ownership Does Not Impute Knowledge of HTSUS Classifications

The Government next supposes that Crown was aware of the misclassification of can ends from Europe because they have "common ownership and management." Opp. at 22. The Government specifically cites Crown's "inter-relatedness and common purpose" as evidence that personnel "knew what they were importing and exporting, and how to classify this merchandise." Opp. at 4.

The Government asserts, with zero facts, that unidentified personnel importing can ends from Europe and Canada were in communication regarding the classification, that those unidentified

---

[7] As discussed below, Crown acknowledged this mistake by filing timely voluntary disclosure to correct the entries of can ends that were misclassified.

personnel knew how to classify the can ends correctly, and that those unidentified personnel intentionally misclassified entries from Europe to avoid payment of 2.6% duties. No such communications have ever emerged in the 13-year history of the Government's investigation. Nevertheless, the Government then directs the Court to conclusively presume, solely on the basis that CCK, Crown USA, and its can end suppliers are related, that its assertions are true. The Government has overreached.[8]

Common ownership is insufficient to impute knowledge of one company's classifications to another, as the Government asserts. Opp. at 2, 4, 22. This is especially true for Crown, which the calls a "billion-dollar conglomerate," employing more than 27,600 in 43 countries during the relevant period. Opp. at 2, 4-5. The Government's Opposition includes several pages to the size and profitability of Crown, Opp. at 4-5, Exhs. 1-3, seemingly as evidence of their presumed "sophistica[tion]" as importers and to account for the fact that the Government is unable to name or otherwise identify any "employees and agents . . . who

---

[8] As noted in the initial round of briefing, such conclusory allegations would open the door to every related party transaction potentially being subject to a fraud claim where there is a mistake in entry declarations.

carried out defendants' fraud scheme." Opp. at 2, 5, and 19. However, the Government's focus misses the point. Opp. at 19-20. Whether the Crown Companies are considered "persons" is irrelevant given the Government's inability to allege actual facts (as opposed to conclusions) in support of its claim that the misclassification of can ends was a coordinated scheme by Crown. Opp. at 20-21.

As explained in the Motion to Dismiss, the Government does not allege that Crown presented intentionally falsified invoices or value data, misrepresented content or origin, falsely described the goods, or otherwise engaged in conduct present in other cases alleging fraud or gross negligence. *See* Mot. at 23-24. It does not do so because it cannot do so. And yet, the Government acknowledges, a complaint of fraud must detail the "'who, what, where, when and how" of the scheme. Opp. at 13. But the Amended Complaint contains no substance beyond generic allegations and broad references to Crown's corporate structure. Even the Government acknowledges its inability to "describe what these employees and agents did," *i.e.* the "how" of such a scheme. Opp. at 19. That admission alone warrants dismissal of these two claims. The information provided in the Opposition only highlights the

implausibility of the Government's premise that all of the companies in the Crown Companies' entire corporate group understood each other's conduct solely by reason of common ownership. Opp. at 4.

In assuming, *arguendo*, the Crown Companies are inherently familiar with each other's tariff classifications, the Government also ignores entirely Crown's corporate organization and structure at the time of the relevant entries. As the Government notes in its Opposition, CCK and Crown USA are both now ultimately controlled by the same company, Crown Holdings. Opp. at 4. Previously, however, CCK was the publicly-traded parent of the entire Crown group. In 1996, CCK created Crown USA to hold all the assets of its U.S. business, including facilities and inventory. Crown Holdings was created in 2003 and took over CCK's role as the publicly-traded parent company of the Crown group. *See* Opp. at Exh. 1, ECF No. 26-2 (Crown Holdings Form 10-K for Period Ended December 31, 2004 at 35) ("In connection with its refinancing and reorganization in 2003. . . [CCK] formed a new public holding company named Crown Holdings, Inc. [CCK] is now a wholly-owned subsidiary of Crown Holdings, Inc."). In 2003, an affiliated company named Crown Cork & Seal Americas, Inc. (now CROWN

11

Americas LLC) ("<u>Crown Americas</u>") was inserted between CCK and Crown USA, such that Crown Holdings owns CCK, which in turn owns Crown Americas, which in turn owns Crown USA. *See* Opp. at Exh. 2, ECF No. 26-3 (Crown Holdings Form 10-K for Period Ended December 31, 2009 at 104).

With these changes, there was also an intercompany realignment of responsibilities, including a clarification of Crown USA's role as the main importing entity for the Crown family. However, this transition, which involved not only customs entries but also every form of expression used by Crown Holdings and its subsidiaries (*i.e.*, letterheads, building signs, standard form contract documents, business cards, breakroom posters, etc.), took some time to work its way through the tens of thousands of global employees of the corporate group. What the Government characterizes as a "fraud scheme," Opp. at 10, 19, 23, was at worst an absence of coordination resulting from this major reorganization of a "multi-billion dollar international conglomerate of companies," and nothing more. Opp. at 4.

In this context, the Government's contention that the Crown Companies' corporate affiliation "foreclose[s] the notion that [the

misclassification of can ends was] inadvertent" is without merit. Opp. at 8. Though the Crown Companies are owned by the same holding company, this fact, on its own, does not "impel the inference" that unidentified personnel know the correct classification of can ends, nor establish a conspiracy to commit fraud or even gross negligence. Opp. at 4. To the contrary, given the size and decentralization of the Crown Companies during this time, the misclassification of a comparatively small sub-set of can ends under a HTSUS code that is not facially incorrect, was simple negligence at worst.

### 3. Differences in the Classification of Can Ends Are the Result of Separate Brokers

The crux of the Government's argument is that the Crown Companies "demonstrated they understood how to correctly classify the metal lids from Europe by correctly classifying the same lids when they came from Canada." Opp. at 31 (citing Am. Compl. ¶¶ 17-23). As Crown has explained, this argument ignores that during the relevant period, CCK and Crown USA continued to utilize their own respective importer of record numbers and Crown used different, external unrelated brokers for imports from Canada and Europe, a fact well known to the Government through its investigation.

13

Despite a laser focus on the common ownership of the Crown Companies, Opp. at 4-5, Exhs. 1-3, the Government continues to dismiss the critical fact that different customs brokers were used to enter the can ends imported from Canada and Europe respectively. Mot. at 16, 32. Indeed, there is no factual allegation or any evidence to support the notion that the same Crown employees supplied the information relating to the classification of can ends to the two different brokers *at all*, let alone that they were aware of the difference in classifications. Nor is there any factual allegation or evidence that the divergent classifications were the result of any coordination between the Crown Companies (or their Canadian and European affiliates) and the independent brokers; this despite the full cooperation of Crown during a thirteen-year investigation in which the Government interviewed employees involved with import compliance at Crown's headquarters, conducted numerous discussions with counsel, and received large quantities of documents concerning the corporate structure of Crown and the manufacture and importation of can ends.[9]

---

[9] Although the Government objects to Crown's statement that there were more than "ten years" of investigations, Opp. at 11, it is not in dispute that this matter commenced in June 2009, when the Crown Companies filed the first of two prior disclosures regarding misclassification of can ends with the Port of Milwaukee. Mot.

The Government implies that the absence of evidence on whether the misclassification of can ends was "intentional" is due to Crown's inability to provide evidence, Opp. at 11. But this ignores the thousands of pages of additional information supplied by Crown to CBP throughout its investigation and the administrative summonses process.[10] It also seeks to shift improperly the burden of proof in this case: the Government has the obligation to establish intent; Crown does not have to prove a lack thereof.

At the same time, the Government willfully ignores or dismisses the evidence Crown *did* provide, which demonstrates that CCK and Crown USA relied on different, external unrelated customs brokers for

---

at 26, n.10. Since that time, CBP has participated in interviews of a number of employees at Crown's headquarters regarding the circumstances of the disclosures, conducted a mitigation conference with counsel for Crown at the Port of Milwaukee, and reviewed large quantities of additional information supplied by Crown regarding the manufacture and import of can ends by Crown, as well as Crown's corporate structure. Mot. at 26. It is unclear how this information gathering process, which the Government itself notes involved the "request[ing of] communications and evidence," Opp. at 11, is distinguishable from an "investigation."

[10] The Government claims that "experience and common sense teach that companies which have committed fraud conceal, obfuscate, alter or destroy such evidence and records, rather than disclosing it." Opp. at 19. If this is true, by the Government's own standard, there can be no plausible fraud claim against Crown given their extensive cooperation with the Government's investigation. It also leads to the conclusion that any target of a Government inquiry that cannot provide affirmative evidence of its innocence is to be presumed guilty. This cannot be the standard that we apply in our legal system.

entering the can ends imported from Canada and from Europe, respectively, during the relevant period. Mot. at 16.[11] The Government ignores the implication of this fact by baselessly alleging that the Crown Companies "– and not their brokers – directed the classification of these metal lids" based "exclusively upon representations from CCS [and] CCS USA." Opp. at 7 (citing Am. Compl. ¶ 15). Yet, the Government fails to show what, if anything, the Crown Companies actually provided to their respective brokers regarding the classification of can ends. Mot. at 15. Instead, the Government's conclusion is based on the fact that the "brokers never possessed, observed, or otherwise controlled any of the subject metal lids." *Id.*

It is obvious the Government misunderstands the role of brokers in customs transactions. The Government claims that the Crown Companies' description of how they classify merchandise is a "flagrant falsehood," Opp. at 31, seemingly based on the belief of Government counsel that "[t]he broker never spearheads the classification ever."

---

[11] Contrary to the Government's claims, Crown is not "claiming that the fraud was caused by their brokers." Opp. at 25. Crown has never suggested that.  Crown maintains that no fraud exists here.

Hearing Tr. at 21 (Mr. Kanellis).  This is plainly wrong.[12]  And the

Court has repeatedly acknowledged the role of brokers in the

classification of merchandise, even going so far as to conduct training to

promote the "prope[r] class[ification of] goods." *United States v. UPS*

*Customhouse Brokerage, Inc.*, 31 C.I.T. 1023, 1024 (2007) ("In an effort

to improve broker compliance in the area of classification . . . Customs

issued letters to and conducted training sessions for customs

brokers[.]")..; *Kahrs Int'l, Inc. v. United States*, 33 C.I.T. 1316, 1339 n.20

(2009) (("[T]he Court must determine whether the government's

classification is correct, both independently and *in comparison with the*

*[ broker's ] alternative*.") (internal quotes omitted) (emphasis added). In

fact, brokers advertise their ability to classify merchandise under the

HTSUS for importers to be compliant.[13] Brokers need not "posses[s] or

"purchas[e]" merchandise to classify it correctly. Opp. at 31. Instead,

classifications are frequently completed based on product specifications

---

[12] The U.S. Department of Commerce describes customs brokers as "oversee[ing] transactions related to customs entry and . . . *product classification*[.]" *See* https://www.trade.gov/customs-brokers-and-freight-forwarders (emphasis added).

[13] The National Customs Brokers and Freight Forwarders Association ("NCBFFA"), the national trade association for customs brokers, regularly offers classification training sessions.  *See* https://www.ncbfaa.org/home/2022/06/15/industry-events/lacbfaa-webinar-hts-classification-workshop-2022 (enrollment for HTSUS classification webinar).

or descriptions on commercial invoices without ever taking control of the goods.

Given the Crown Companies' size and the use of separate brokers to classify entries from Europe and Canada, the Government's conclusory allegation that the Crown Companies "knew that the subject metal lids were supposed to be classified under HTSUS subheading 8309.90.0000" is simply insufficient as a matter of law to sustain a claim of fraud or gross negligence. Am. Compl. ¶ 18. That a corporate structure of this size had inconsistent classifications and lacked oversight of different brokers handling shipments from two different parts of the world cannot elevate a simple negligence claim to one of fraud or even of gross negligence. The facts alleged by the Government in its Amended Complaint and in its Opposition at best state a claim— at the pleading stage—for negligence, not fraud or gross negligence.

### 4. Import Statistics do not Establish that the Misclassification of Can Ends was Intentional

In its Amended Complaint and Opposition, the Government places great weight on the same exhibit that was attached to the initial Complaint detailing the entries alleged to be misclassified, including the entry number, date of entry, place of entry, HTSUS classification,

duty rate, and value of each entry. Opp. at 2; Am. Compl. at Exh. A.

The Government's position that this entry information – without more –

is sufficient to set forth the "'who, what, when, where and how' of the

alleged fraud," Opp. at 2, is based on its faulty assumption that a

misclassification is necessarily a "false statement." Am. Compl. at 12,

13, 17, 26-28, 33; Opp. at 2, 7-9, 11, 22, 25, 28, 30, 32. As detailed in the

Motion to Dismiss, the Government's categorization of misclassification

as "false statements" improperly implies intent where none exists. Mot.

at 14. Entry data alone, without context or corroboration, cannot be

sufficient to establish "the specific circumstances underlying each

entry," as the Government claims. Opp. at 9 (quoting Am. Compl. ¶ 12).

A misclassification corrected through lawful channels[14] is neither a

false declaration nor a false statement. Opp. at 23. If it were, every

single misclassification of a HTSUS subheading would be deemed to

---

[14] As detailed in the Crown Companies' Motion to Dismiss, voluntary disclosures are not an admission of fraud, Am. Compl. ¶ 14, but rather a lawful mechanism for importers to report the circumstances of a violation to CBP before commencement of a formal investigation and thereby to correct an error of which it has become aware and limit its potential penalty liability. See 19 U.S.C. § 1592(c)(4). Mot. at 12. The filing of a voluntary disclosure has been recognized as indicative of a "good faith effort to comply with the statute" by this Court. *United States v. Nat'l Semiconductor Corp.*, 30 C.I.T. 769, 771, *modified on reconsideration*, 30 C.I.T. 1428 (2006), *vacated and remanded*, 496 F.3d 1354 (Fed. Cir. 2007).

constitute fraud, contrary to the fundamental notion of what constitutes fraud in our legal framework. The Amended Complaint does not detail the "manner and means" of the alleged "fraudulent scheme;" all it details is that 543 import entries  from Europe were incorrect.[15] Opp. at 23. This superficial information, which provides no insight into the motivation or intent underlying the alleged "fraud scheme," has already been deemed insufficient to overcome a Motion to Dismiss by this Court. Order, ECF No. 22.

Moreover, contrary to the Government's claims, Crown did not cause any false statements to be submitted to the government, and its inadvertent misclassification did not "deprive United States taxpayers" of any money. The Government's misleading "wordplay" ignores the fact that the Crown Companies have already paid the full amount of duties they owed. Opp. at 2, 7. As the Government acknowledges:  "[n]either defendant owes unpaid duties to the Government." Opp. 10. The Government's theory of the case – that the Crown Companies' motive to misclassify their metal lid imports from Europe [was] to avoid payment

---

[15] Notably, this was not all of the entries from Europe during the relevant time period.

of almost $1.3 million in duties – is undermined by the fact that the Crown Companies took corrective action as soon as they became aware of the discrepancy in the classification of can ends, including by filing prior disclosures and tendering the full amount of lost revenue *in 2009*.[16]

In fact, the Government presents no plausible motive – the "why" - for the Crown Companies or "their co-conspirators," presumably individual employees of the Crown Companies, to intentionally misclassify the can ends at issue. Opp. at 28. In "determining whether a complaint states a plausible claim" the court is tasked with "draw[ing] on its experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009).[17] Even the Government concedes that only a very small fraction of the Crown Companies' U.S. food can end sales, and an even

---

[16] The Government again fails to indicate that the Crown Companies promptly filed voluntary prior disclosures when made aware of the erroneous classification. Crown USA filed an initial prior disclosure on June 26, 2009, and filed a final written submission on September 23, 2009.

[17] The Government again cites *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990), which "instruct[s] that a complaint must identify 'the who, what, where, when and how' of the scheme." Opp. at 2, 13-14. In *DiLeo*, however, the reviewing court found the complaint to be inadequate based on its failure to identify the perpetrator of the alleged fraud or "what that person might have had to gain" from their participation. 901 F.2d at 629.  "One who believes that another has behaved irrationally has to make a strong case." *Id.* The Government has not done so here.

smaller fraction of their total food can sales (i.e., can body plus can end),
had any connection to these imports. Opp. at 5. In the context of
Crown's total business activity in the United States, which included the
manufacture and/or sale of beverage cans and ends, food cans and ends,
aerosol cans and ends, bottlecaps, bottle and jar lids, promotional metal
tins for cookies and alcohol, as well as machinery and equipment for the
can industry, the activity involved in this case is wholly immaterial.
Indeed, the Government's focus on Crown's profitability during the
relevant period highlights how insignificant the 2.6% in duty savings
would have been to a company of its size. In the context of more than
$44 billion in annual consolidated net sales over six years, savings of
$1.2 million over the same six years is not substantial enough to
incentivize a "complex and far-reaching fraudulent scheme." Opp. at 5,
17.

     Because the 543 entries at issue represent only a tiny fraction of
Crown's imports, with a miniscule amount of savings resulting from the
avoidance of a 2.6% *ad valorem* duty compared to Crown's total sales,
there continues to be no "common sense" motivation – no "why" – for
Crown to perpetrate this alleged scheme. Crown employees are not

compensated for cost savings that might be engendered by tariff rates, and the Government has not alleged receipt by any employee or agent of "kickbacks" or any other incentives for duty savings, so there would similarly not be any incentive for an individual employee to unilaterally change or to cause to be changed the classification of these imports to avoid additional duties.

Crown disputes that the "facts and circumstances surrounding each of the 543 entries of metal lids" establish an "extraordinary high probability" that the inadvertent misclassification was intentional. Opp. at 8-9, 23. The Government cites *United States v. Mariner Health Care, Inc.* for the premise that "statistical probabilities" may support a claim of fraud. In that case, however, that Court found that the claim "require[d] *specific evidence of unlawful conduct* in addition to statistical evidence." Opp. at 8-9 (citing No. 18-CV-00653-EMC, 2021 WL 4259907 (N.D. Cal. Aug. 5, 2021)) (emphasis added). In other words, the plaintiff's statistical models evidencing fraud were only sufficient when "combined with the particular details . . . provided regarding the 'who, what, when, where, and how' of the fraudulent scheme." *Id.* The Amended Complaint continues to fall short of this threshold test.

The fact that products from separate locations classified independently by separate brokers does not "reduce to nearly zero the statistical probability that defendants' misclassification of lids from Europe could have been inadvertent or coincidental," as the Government claims. Opp. at 8. It merely evidences a large and growing company undergoing a cooperate reorganization. Without more, the Government's claims of fraud and gross negligence do not "[c]ross the line from conceivable to plausible" and should be dismissed. *Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 672 F.3d 1041, 1063 (Fed. Cir. 2012).

## B.    There Is No Legal Basis To Support Plaintiff's Fraud Claim

As Plaintiff twice notes, "[t]he level of particularity required [under Rule 9(b)] depends on the nature of a case." Opp. at 17, 30 (quoting *E–Shops Corp. v. U.S. Bank Nat. Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012)).[18] Seemingly in recognition of its inability to plead its fraud claims with requisite particularity, the Government highlights that the

---

[18] In *E–Shops*, the court dismissed the complaint as not satisfying Rule 9(b)'s particularity requirements where, as here, it failed to "identify the employees, state their positions . . . , state how they acquired [fraudulent] information, or whether the employees were authorized to speak on behalf of [Defendant]." 678 F.3d at 663–64.

specificity requirement may be "relaxed . . . as an exception" where the "necessary evidence of fraud is in the exclusive control of the defendant or when a fraudulent scheme alleged is complex or occurred over a long period of time." Opp. at 17. However, as detailed in the Motion to Dismiss and above, the purported fraud at issue is not a "complex scheme" and proof does not rest with the Crown Companies, who have fully cooperated with and provided extensive documentation to the Government over the course of a decade. Given the absence of any scheme in the first place, such "proof" simply does not exist. Opp. at 18.

The Government's effort to categorize Crown's misclassification of can ends as a "complex" fraud scheme likewise misses the mark. Opp. at 17. The complexities in the cases cited by the Government are not only absent here, but also do not negate the particularity requirements of USCIT Rule 9(b).[19] For example, in *United States ex rel. Semtner v. Medical Consultants, Inc.*, 170 F.R.D. 490, 498 (W.D. Okl. 1997), Opp. at 17, the court found that the "exact nature of each allegedly fraudulent document" need not be pled where there were "thousands of

---

[19] Ironically, in at least six of the cases cited by the Government, the reviewing courts ultimately found that fraud was <u>not</u> pled with requisite particularity. *See Defendants'* Reply in Support of Motion to Dismiss, ECF No. 14, at n.10.

billing documents." *Id.* at 498. However, the district court still required the government to identify "how the scheme operated" and to provide a description of "the defendants' actions," even though it did not identify them by name. *Id.*

Even in the case of a "complex and far-reaching fraudulent scheme," the reviewing courts have found that "it is insufficient to simply plead the scheme[.]" Opp. at 17 (quoting *Chesbrough v. VPA P.C.*, 655 F. 3d 461, 470 (6th Cir. 2011)). While the Government points to the table identifying each of the 543 misclassified HTSUS subheadings as providing the requisite detail to enable Crown to mount a full defense, Opp. at 24-26, those entries, without more, do not describe, imply, or suggest improper conduct, and provide no notice to Crown of the complex "fraudulent scheme" the Government believes them to have participated in. In fact, the Government provides no details in the Amended Complaint connecting even a sampling of those 543 entries to the allegedly fraudulent scheme or conduct that rises to the level of gross negligence.

Crown's ability to identify deficiencies in the Amended Complaint does not "evince that the Government's allegations of fraud were"

sufficient. Opp. at 25-26.  Crown's "offering [of] numerous factual explanations" for the misclassifications is highly relevant to the Government's failure to meet its burden in alleging fraud. Indeed, it is well established that an allegation of fraud carries a heightened burden of proof in U.S. law. Given that intent is a requisite element to support a claim of fraud, Mot. at 9, the Government's statements that the Crown Companies' "arguments over facts are misplaced" and "are of the type made to a jury at closing argument" are disingenuous. Opp. at 27. The Amended Complaint simply fails to "set forth specific facts supporting an inference of fraudulent intent." Opp. at 27 (quoting *Ibe v. Jones*, 836 F. 3d 516, 525 (5th Cir. 2016)). In fact, as detailed above, the Amended Complaint and the Opposition demonstrate the absence of a common sense reason for the Crown Companies or their employees to have intentionally misclassified can ends. *See* Section II.A.4., *supra*. The Crown Companies had neither the "motive [nor] opportunity to commit fraud" and the Government has not otherwise "alleg[ed] facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  Opp. at 27 (quoting *Schwartzco Enters. LLC. v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 344 (E.D.N.Y. 2014)).

Despite the Government's claims, the provision of entries alone does not "plainly depic[t] a motive, opportunity, and intent to commit fraud," Opp. at 28, and there are no facts alleged in the Amended Complaint that otherwise "plausibly give rise" to the Government's fraud claim. *Iqbal*, 556 U.S. at 662. To the contrary, an examination of precedent under 19 U.S.C. § 1592 reveals that the fraud provision is not intended to punish HTSUS misclassification. Mot. at 8-11. As detailed below and in the Motion to Dismiss, cases that have arisen in this context consistently involve negligence claims, not fraud or gross negligence. *See* Mot. at 30-34 (citing *United States v. Great Neck Saw Manufacturers, Inc.*, No. 17-00049, 2018 WL 1840207, at *1, *4 (Ct. Int'l Trade Apr. 16, 2018); *United States v. Sterling Footwear Inc.*, 279 F. Supp. 3d 1113 (Ct. Int'l Trade 2017)).

Unable to cite precedent specifically addressing the misclassification of Customs entries, the Government instead points to *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 233 (1st Cir. 2004), a case involving a health care providers' alleged submission of false Medicare and Medicaid claims to the federal government. Opp. at 15. The Government fails to mention in its

28

Opposition that the court ultimately dismissed the complaint in

*Karvelas* for "failure to identify with particularity any actual false

claims that the defendants submitted to the government[.]" *Karvelas*,

360 F.3d at 235. Specifically, while the complaint identified sixteen

separate schemes to defraud the government, including the false

certification of cost reports and confirmation of orders, it did "not

identify or describe the individuals involved in the improper billing or

allege with particularity any certification of compliance with federal

regulations in order to obtain payments." *Id.* at 233. Amongst other

things, this failure to provide a "factual basis for [the] conclusory

allegations that the defendants submitted actual false or fraudulent

claims to the government," was found to be "fatal" to the complaint. *Id.*

at 233.

Neither *Karvelas*, nor any of other cases cited by the Government,

support its position that Crown had knowledge of the correct

classification of can ends being imported and intentionally failed to use

the correct classification. The Amended Complaint does not support the

Government's allegation that the Crown Companies "demonstrated they

understood how to correctly classify the metal lids," Opp. at 31,

29

especially given that metal lids imported from Europe and Canada were overseen by separate brokers and classified independently. Though the Government claims that it is "patently absurd" that it should be expected to identify "*who*" carried out the fraud scheme or "*what*" they did, Opp. at 19, this is precisely what is required to sustain a claim of fraud, especially after 10+ years of investigating. Opp. at 13 ("A complaint of fraud 'must include informational elements of '*who*, *what*, when, where, and how[.]'") (emphasis added). Contrary to the Government's claims, incorrect entries, without more, do not substantiate the who, what, where, when, or how of a fraud claim. Opp. at 23-24.

### C.   There Is No Legal Basis To Support Plaintiff's Gross Negligence Claim

Though gross negligence carries a lesser burden of proof than claims of fraud,[20] cases in which this Court has found support for a

---

[20] Contrary to the Government's assertion, Crown does not argue that the Supreme Court's ruling in *Iqbal* or Rule 9(b) are the appropriate standard for gross negligence. Opp. at 28-29. The Government misunderstands language in the introduction of the Motion to Dismiss, which states that the Government has not sufficiently alleged its claims for *either* fraud, or even for gross negligence. Mot. at 4-5.

gross negligence consistently involve *something more* than just an incorrect HTSUS subheading. Mot. at 30.

The Government's attempts to distinguish the Court's rulings in such cases, most notably *Great Neck* and *Sterling Footwear*, are unavailing. Opp. at 30-34. Though there is no bright line rule or "categorica[l] require[ment]" that a claim for gross negligence "must involve a prior notification, and . . . a subsequent decision to ignore the warning," Opp. at 30, such behavior has been deemed the kind of evidence necessary to support a claim for gross negligence in the past, with the Court consistently looking to some evidence of knowledge of the wrongful conduct to support a claim for gross negligence.

By citing this precedent, Crown is not "adduc[ing] a new pleading standard," but rather detailing the kinds of behavior found to constitute gross negligence by the Court and distinguishing the actions of Crown in this case. Mot. at 30-32 (identifying "a clear distinction between the two claims tied to the Government's allegations that it notified Great Neck that the commissions were nondeductible on a specific date, but Great Neck *continued to deduct them anyway*") (emphasis in original). This exercise is, in fact, the function of precedent, which establishes

parameters that guide a court's decisions. For example, prior

notification from CBP and a decision to ignore that notification

evidences a defendants' "actual knowledge of or wanton disregard for

the relevant facts and with indifference to or disregard for the offender's

obligations under the statute.'" Opp. at 30 (quoting *Sterling Footwear,*

279 F. Supp.3d 1113, 1138). By contrast, the prompt filing of a prior

disclosure and the tendering of the full amount of lost revenue upon

discovery of a misclassification, the engagement of private customs

counsel to review tariff classifications and other customs procedures,

the hiring of an experienced licensed customs broker to oversee customs

filings, and the development a customs compliance program, as the

Crown Companies did in the months immediately following their prior

disclosures, reveals a well-intentioned importer that simply made a

mistake.

   As these cases demonstrate, even to support its claim of gross

negligence, the Government must provide *some* factual basis for its

allegation that the Crown Companies "instructed their brokers on how

to classify these lids." Opp. at 32. As an example*,* in  *Sterling Footwear,*

CBP contacted defendant's "nine customs brokers and requested that

they respond to a questionnaire asking, in part, who determined the classifications." 279 F. Supp. 3d 1113, 1124. The allegations of gross negligence were premised, in part, on the fact that "most of the customs brokers stated that they had entered [Plaintiff's imports] *under the tariff provisions provided by [Plaintiff]*." *Id.* (emphasis added). There is nothing like that here, despite the extensive investigation conducted by CBP with Crown's full cooperation.

The use of an incorrect HTSUS subheading "in lieu of the correct HTSUS subheading," Opp. at 24, does not amount to gross negligence. Without more, the circumstantial evidence and conclusory allegations presented in the Amended Complaint are simply not enough.

## III.   CONCLUSION

After more than a decade of investigating and being given a second opportunity by this Court to replead its claims, the Government *still* has failed to plead facts sufficient to sustain claims of fraud and gross negligence. Simply identifying misclassified HTSUS subheadings cannot be the basis for fraud or even gross negligence claims. The threat alone might tempt CBP into pressuring importers into higher negligence settlements, which would be a misuse of CBP's authority.

For these reasons, Crown respectfully requests that the Court dismiss Counts I and II of the Amended Complaint *with prejudice* and without leave to amend.

Respectfully Submitted,

**/s/ Jackson D Toof**
Jackson D. Toof
Leah N. Scarpelli

**ArentFox Schiff LLP**
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6000
Fax: (202) 857-6395
Email:   jackson.toof@afslaw.com
            leah.scarpelli@afslaw.com

*Counsel for Defendants Crown Cork & Seal, USA, Inc. and Crown Cork & Seal Co., Inc.*

## **CERTIFICATE OF COMPLIANCE**

I, Jackson D. Toof, an attorney with the law firm ArentFox Schiff LLP, which represents Defendants in this action, relying up on the word count feature of the word processing program used to prepare this motion, hereby certify that this motion complies with the word count limitation under the Court's Chamber Procedures, and contains 6,922 words.